COMMITTEE ON PROFESSIONAL ETHICS AND CONDUCT OF the IOWA STATE BAR ASSOCIATION, Plaintiff,

v.

Mark A. HUMPHREY and Fredd J. Haas, d/b/a Humphrey and Haas, Defendants.

No. 69088.

Supreme Court of Iowa.

Sept. 19, 1984.

Nick Critelli of Critelli & Sherburne, Des Moines, and Frank A. Comito of Comito & Capps, Des Moines, for plaintiff.

Mark W. Bennett of Babich, Bennett & Nickerson, Des Moines, and Wilcox & Ogden, Golden, Colorado, for defendants.

Erwin G. Krasnow and Barry D. Umansky, Washington, D.C., for amici curiae,

Iowa Broadcasters Ass'n and Nat. Ass'n of Broadcasters.

John W. Carley, Gen. Counsel, and William W. Jacobs, and Brenda W. Doubrava, Cleveland, Ohio, for amicus curiae, F.T.C.

HARRIS, Justice.

Our rule on lawyer advertising expressly prohibits television advertisements which contain background sound, visual displays, more than a single, nondramatic voice or self-laudatory statements. Believing the rule exceeded the standards outlined by the United States Supreme Court, defendant lawyers bought and aired television advertisements in clear violation of it. Plaintiff committee then brought this original action before us to enjoin the advertisements. Defendants answered and counterclaimed, asking that the rule, to the extent of the violation, be set aside as unconstitutional. We think the rule passes constitutional muster and order issuance of a permanent injunction.

The factual background can be briefly stated. In September of 1982, Des Moines attorneys Mark A. Humphrey, Fredd J. Haas, and James E. Gritzner, without seeking prior permission, aired the advertisements over a Des Moines television station for a three-day period. They had purchased the ads from a Denver corporation.

The ads were of three types. The first featured an actor and actress portraying a physician and nurse in an examination room. While the "nurse" looks at an X-ray, the "physician" says:

> We see first-hand injuries caused by the neglect of others. If you're seriously injured through the negligence of others, you should be talking to a lawyer. The choice of lawyer could be important. That's something to think about.

The second ad featured an actor portraying a printer standing in front of a press. The "printer" says:

> I suffered loss of wages, incurred staggering medical bills, and endured pain and suffering all through the negligence of others. I wasn't aware of my legal rights. I should have been talking to a lawyer.

The third featured actors portraying bowlers. The following conversation takes place at the lanes:

> Bowler 1: I've got to throw like that today; we're one man short.
>
> Bowler 2: He was injured through the negligence of others.
>
> Bowler 1: He should be talking to a lawyer.
>
> Bowler 2: The choice of that lawyer will be important.
>
> Bowler 1: That's something to think about.

In each of the advertisements, after the brief dramatization, the picture switches to a person portraying a receptionist in a law office. The name, address, phone number, and areas of practice of defendants' law firm are superimposed over the picture, and a voice says:

> If you're injured through the negligence of others, call the law firm of Humphrey, Haas & Gritzner. Cases involving auto accidents, work comp, serious personal injury and wrongful death handled on a percentage basis. No charge for initial consultation. Call now at 288–0102.

The voice repeats the phone number twice.

The television station discontinued the advertisements following a request from the ethics committee. The committee then commenced this action, requesting us to enjoin defendants from using the ads because they violate our professional canons DR 2–101 and DR 2–105. We granted a temporary injunction.

By answer and counterclaim, based on 42 U.S.C. § 1983, defendants Humphrey and Haas,[1] asserted that DR 2–101 and DR

---

**1.** Gritzner had withdrawn from the firm by this time and, in October 1982, we dismissed the action as to him.

2–105 violate the first and fourteenth amendments of the United States constitution. They also asserted the phrase "non-dramatic voice" in DR 2–101(B) and the phrase "self-laudatory" in DR 2–101(A) are void for vagueness under the first and fourteenth amendments.

In July 1983, an evidentiary hearing was held before the Honorable C. Edwin Moore. We appointed senior judge Moore as commissioner of this court to conduct the hearing and summarize the evidence. The matter is before us on the record made before him.

Prior to 1977 Iowa's canons of ethics, in common with most such canons, strictly forbade lawyer advertising. The prohibition for the most part was never questioned. Indeed, prior to relatively recent times, the United States Supreme Court viewed regulation of commercial speech as tantamount to the regulation of a business activity: wholly permissible and without the protection of the first amendment. *Valentine v. Chrestensen*, 316 U.S. 52, 62 S.Ct. 920, 86 L.Ed. 1262 (1942).

Commercial free speech, however, was recognized by the court in *Virginia Pharmacy Board v. Virginia Consumer Council*, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). The right was first applied for lawyers in *Bates v. State Bar of Arizona*, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977), which held that no longer could a state absolutely prohibit lawyer advertising. It could only regulate it. The *Bates* opinion was later explained by the court in the case of *In re R.M.J.*, 455 U.S. 191, 199–202, 102 S.Ct. 929, 935–37, 71 L.Ed.2d 64, 71–74 (1982):

The *Bates* Court held that ... lawyer advertising was a form of commercial speech, protected by the First Amendment and that 'advertising' by attorneys may not be subject to blanket suppression. [Citing *Bates*]

More specifically, the *Bates* Court held that lawyers must be permitted to advertise the fees they charge for certain 'routine' legal services. The court concluded that this sort of press advertising was not 'inherently' misleading, and therefore could not be prohibited on that basis. The court also rejected a number of other justifications for broad restrictions on advertising including the potential adverse effect of advertising on professionalism, on the administration of justice, and on the cost and quality of the legal services, as well as the difficulties of enforcing standards short of an outright prohibition. None of these interests was found to be sufficiently strong or sufficiently affected by lawyer advertising to justify a prohibition.

But the decision in *Bates* nevertheless was a narrow one. The Court emphasized that advertising by lawyers still could be regulated. False, deceptive, or misleading advertising remains subject to restraint, and the court recognized that advertising by the professions poses special risks of deception—'[B]ecause the public lacks sophistication concerning legal services, misstatements that might be overlooked or deemed unimportant and other advertising may be found quite inappropriate in legal advertising.' [Citing *Bates*] The Court suggested that claims as to quality or in-person solicitation might be so likely to mislead as to warrant restriction. And the Court noted that a warning or disclaimer might be appropriately required, even in the context of advertising as to price, in order to dissipate the possibility of consumer confusion or deception. '[T]he bar retains the power to correct omissions that have the effect of presenting an inaccurate picture, [although] the preferred remedy is more disclosure, rather than less. [Citing *Bates*]

In short, although the Court in *Bates* was not persuaded that price advertising for 'routine' services was necessarily or inherently misleading, and although the Court was not receptive to other justifications for restricting such advertising, it did not by any means foreclose restrictions on potentially or demonstrably misleading advertising. Indeed, the Court recognized the special possibilities for de-

ception presented by advertising for professional services. The public's comparative lack of knowledge, the limited ability of the professions to police themselves, and the absence of any standardization in the 'product' renders advertising for professional services especially susceptible to abuses that the States have a legitimate interest in controlling.

Thus, the Court has made clear in *Bates* and subsequent cases that regulation—and imposition of discipline—are permissible where the particular advertising is inherently likely to deceive or where the record indicates that a particular form or method of advertising has in fact been deceptive. *Id.*

Other cases, in which the court considered restrictions on lawyer advertising, were *In re Primus*, 436 U.S. 412, 98 S.Ct. 1893, 56 L.Ed.2d 417 (1978) (political expression or association by lawyer working for American Civil Liberties Union called for "exacting scrutiny applicable to limitations on core first amendment rights" in reviewing lawyer solicitation rule) and *Ohralik v. Ohio State Bar Association*, 436 U.S. 447, 98 S.Ct. 1912, 56 L.Ed.2d 444, (1978) (lower level of judicial scrutiny required for rule prohibiting in-person solicitation by lawyer).

To summarize the foregoing cases, the court set aside, as a special category, advertising which is misleading or which experience has proved to be inherently misleading. Commercial speech in this category can be appropriately restricted. Misleading advertising can be prohibited. Other lawyer advertising can be regulated if the state first demonstrates a compelling interest. But any restrictions must be narrowly drawn, and the state may regulate only to the extent regulation furthers substantial state interest.

Commercial free speech challenges to advertising rules are to be reviewed under the four-part analysis specified in *Central*

*Hudson Gas v. Public Service Comm'n*, 447 U.S. 557, 566, 100 S.Ct. 2343, 2351, 65 L.Ed.2d 341, 351 (1980). As we shall point out, a special problem is recognized in advertising by way of the electronic media.

We took some care in responding to the *Bates* opinion. We asked the ethics committee[2] to conduct public hearings, to investigate the matter of lawyer advertising, and to file with us a report with recommended advertising rules for the profession. After hearings and considerable study, the committee filed its report with us on January 18, 1980. Following our own extended study and consideration, we entered an order on May 6, 1980, which in effect adopted the committee's report and recommendations.

Despite objection voiced before the committee and later carefully considered by us, the rules contain the provision challenged here. DR 2–101 specifies in considerable detail what advertising is and is not prohibited. DR 2–101(A) generally prohibits:

[A]ny form of public communication which contains a false, fraudulent, misleading, deceptive, self-laudatory or unfair statement, which contains any statement or claim relating to the quality of .... legal services, which appeals to the emotions, prejudices, or likes and dislikes of a person, or which contains any claim that is not verifiable ....

DR 2–101(B) separately deals with newspapers or periodicals, telephone directories, radio, and television. The rule lists 19 items thought to be useful to the public (names, fields of practice, office and telephone answering service hours, hourly fee rate, fixed fees, range of fees for specific legal services, date and place of bar admissions, various licenses and memberships, etc.). Only the listed items may be communicated to the public. As to television advertising the rule provides:

The same information, in words and numbers only, articulated by a single

2. The committee on professional ethics and conduct of the Iowa state bar association. Seven lawyer members of the committee are appointed, subject to our confirmation, by the Iowa state bar association. We appoint two lay members of the committee. See Iowa Court Rule 118.2.

non-dramatic voice, not that of the lawyer, and with no other background sound, may be communicated on television. In the case of television, no visual display shall be allowed except that allowed in print as articulated by the announcer. All such communications on radio and television, to the extent possible, shall be made only in the geographical area in which the lawyer maintains offices or in which a significant part of the lawyer's clientele resides. Any such information shall be presented in a dignified manner . . . .

I. Our advertising rule encompasses the "safe harbor" concept. The listed items may be communicated by the manner specified. A lawyer who feels constrained by the rules may petition to have them changed. The committee, as our commissioner acting on its own motion or upon the request of any Iowa lawyer, is to consider proposed amendments to the advertisement rules. *See* DR 2–101(D). Any recommended changes are to be considered by us and a prompt appeal to us is provided from the committee's rejection of requested changes. *Id.*

■ This proceeding, of course, is no such appeal. Rather than proposing rule changes which would authorize their television advertisements, defendants chose to violate the rule and defend their violation by challenging its constitutionality. Accordingly, we are dealing only with the rule's constitutionality, not with its wisdom. It should be scarcely necessary to point out that any lawyer asserting the wisdom of a rule change, should present the proposal to the committee under the procedure we have provided. The professional disciplinary system would be in utter chaos if violations could be defended on the ground the lawyer involved could think of a better rule.

Because the challenge is limited to its constitutional basis, we have set aside a number of criticisms that go only to the wisdom of the rule.

II. The United States Supreme Court seems not to have specifically addressed the use of sound, visual displays, and dramatization, but seems to clearly have recognized the electronic use of those devices as potentially misleading. It has referred to the "special problems" of television advertising:

> [T]he special problems of advertising on the electronic broadcast media will warrant special consideration. *Cf. Capital Broadcasting Co. v. Mitchell,* 333 F.Supp. 582 (D.C.1971), aff'd sub nom *Capital Broadcasting Co. v. Acting Attorney General,* 405 U.S. 1000, 92 S.Ct. 1289, 31 L.Ed.2d 472 (1972).[3]

*Bates,* 433 U.S. at 384, 97 S.Ct. at 2709, 53 L.Ed.2d at 836.

In several cases, the court has described the broadcast media as uniquely pervasive or intrusive. *Federal Communications Commission v. Pacifica Foundation,* 438 U.S. 726, 748, 98 S.Ct. 3026, 3039, 57 L.Ed.2d 1073, 1093 (1978) ("the broadcast media has established a uniquely pervasive presence in the lives of all Americans."); *Columbia Broadcasting System, Inc. v. Democratic National Committee,* 412 U.S. 94, 127, 93 S.Ct. 2080, 2098, 36 L.Ed.2d 772, 798 (1973) ("viewers constitute a 'captive audience.'"); *Metromedia, Inc. v. City of San Diego,* 453 U.S. 490, 501, 101 S.Ct. 2882, 2889, 69 L.Ed.2d 800, 811 (1981) ("Each method of communicating ideas is 'a law unto itself' and that law must reflect

---

**3.** The case cited by the Court contains the following statement:

The fact is that there are significant differences between the electronic media and print. As the court noted in *Branzhaf* [*v. F.C.C.,* 132 U.S.App.D.C. 14, 405 F.2d 1082, 1100–01 (1968) cert. den. 396 U.S. 842, 90 S.Ct. 50, 24 L.Ed.2d 93], written messages are not communicated unless they are read, and reading requires an affirmative act. Broadcast messages, in contrast, are 'in the air'. In an age of omnipresent radio, there scarcely breathes a citizen who does not know some part of a leading cigarette jingle by heart. . . . It is difficult to calculate the subliminal impact of this pervasive propaganda, which may be heard even if not listened to, but it may reasonably be thought greater than the impact of the written word.

*Capital Broadcasting Co.,* 333 F.Supp. at 586.

the 'differing natures, values, abuses, and dangers' of each method.")

It is in view of these "special problems" that the committee argues two ways in which it feels the public might be misled[4] by defendant's television ads. First, the ad states that certain cases are handled on a percentage basis and there is no other charge for initial consultation. The committee thinks these statements mislead people into believing that pursuing the listed cases is a cost-free venture. It points out that the ads are "conspicuously" silent with regard to payment of expert witness fees and of other costs of litigation. The committee asserts defendants, like the defendant in *Ohralik v. Ohio State Bar Association*, 436 U.S. at 467, 98 S.Ct. at 1924, 56 L.Ed.2d at 461, used the contingency fee as a lure:

> He emphasized that his fee would come out of the recovery, thereby tempting the young women with what sounded like a cost-free and therefore irresistible offer.

The second way the committee thinks defendant's ads are misleading stems from the statements which are thought to be self-laudatory comment on the advertisers' expertise. The committee argued that the firm's experience did not match their representation:

> Defendants had little in the way of experience when the commercials were broadcast. After graduation from law school, Mr. Humphrey had tried six cases, the nature of which are unknown, all while under the supervision of another Des Moines law firm. Mr. Haas had virtually no trial experience. Together, defendants Humphrey and Haas had only tried one case.

Without suggesting that the advertisements here were deceitful, we do agree with the committee that, in the medium

defendants chose, the public could well be misled by them. We think the situation is exactly what the United States supreme court had in mind when it referred to the "special problems" in electronic media advertising. We think the challenged rule falls clearly within the area left to us by the *Bates* opinion.

■ The court has said that the state can regulate those types of advertising which result in intrusion, intimidation, overreaching, or undue influence. *See Ohralik*, 436 U.S. at 462, 98 S.Ct. at 1921, 56 L.Ed.2d at 457. A state can regulate advertisements which are inherently likely to deceive, or which the experience has proven to be subject to abuse. *See R.M.J.*, 455 U.S. at 202–03, 102 S.Ct. at 937, 71 L.Ed.2d at 73–74.

The court in *Bates* condemned those advertising rules which amounted to restrictions on the flow of "relevant information needed to reach an informed decision." *Bates*, 433 U.S. at 374, 97 S.Ct. 2704, 53 L.Ed.2d at 829–30. The committee's position is that the *Bates* rationale does not apply to irrelevant information. Information is not relevant if it makes no contribution to informed decision making. In other words, prohibition of such information does not impede, and in fact advances, the fostering of rational decision making and maintaining of the bar's professionalism.

■ We think the ads here would not aid the public in making the informed decision which is subject to the protection recognized in *Bates*. This was the holding in *Bishop v. Committee on Professional Ethics*, 521 F.Supp. 1219, 1229 (S.D.Iowa 1981), which rejected a similar challenge to our rule, as it relates to television advertising.

The gist of the *Bishop* holding, as we understand, is that electronic promotional

---

**4.** The proposed model rule of professional conduct 7.1 defines a "false or misleading" communication as follows:

A communication is false or misleading if it:
(a) contains a material misrepresentation of fact or law, or omits a fact necessary to make the statement considered as a whole not materially misleading;

(b) is likely to create an unjustified expectation about results the lawyer can achieve, or states or implies that the lawyer can achieve results by means that violate the rules of professional conduct or other law; or

(c) compares the lawyer's services with other lawyers' services, unless the comparison can be factually substantiated.

advertising can be prohibited. This was our understanding when we considered and adopted our advertising rule. It is no insult to the advertising industry, or to the electronic media, to believe that, when their efforts are combined on behalf of a lawyer, a line can and should be drawn between what informs the public and what promotes the lawyer. We thought the cases we have discussed allowed, even encouraged, us to draw such a line and we carefully tried to draw it in such a way that the public would be informed and not misled. We think the rule is constitutional.

III. It is perhaps unnecessary, under our analysis, to explore the state interests involved. We do think the state interests in the challenged provisions of the rule are substantial. One such interest was recognized in *Bates:* fostering rational, intelligent, and voluntary decision making in determining the need for legal services and selecting a lawyer. *Bates,* 433 U.S. at 377, 97 S.Ct. at 2705, 53 L.Ed.2d at 831. *See also R.M.J.,* 455 U.S. at 200–01, 101 S.Ct. at 936, 71 L.Ed.2d at 72–73. We think the rule directly advances the state interest by aiding the citizen in making an intelligent selection of counsel.

IV. We reject defendants' contention that the prohibition against background sound, visual displays, multiple dramatic statements, and self-laudatory statements is more extensive than necessary to serve the state interests. All that is prohibited are the tools which would manipulate the viewer's mind and will.

Neither do we agree with defendants' criticism of what they call our "laundry list" approach. We specifically allowed dissemination of all information necessary to assist the public in seeking and selecting counsel. As previously mentioned, a procedure is in place for considering any suggested additions of useful information.

Neither do we find merit in defendants' vagueness defense. In their brief, defendants fail to mention why they believe "nondramatic voice" and "self-laudatory" are vague phrases. In its amicus brief, however, *F.T.C.* asserts that all advertisements are, to some degree, self-laudatory, and that all defendants' ads are no more self-laudatory than the information allowed under the rule. The commissioner also fears the prohibition against "self-laudatory" statements sets up an inherently subjective standard that can result in inconsistent treatment of identical conduct.

We explained the vagueness standard in *Incorporated City of Denison v. Clabaugh,* 306 N.W.2d 748, 751–52 (1981):

A civil statute is unconstitutionally vague under the due process clause of the fourteenth amendment of the United States constitution when its language does not convey a sufficiently definite warning of proscribed conduct, when measured by common understanding or practice. [Authority.] Thus, when persons must necessarily guess at the meaning of the statute and its applicability, the statute is unconstitutionally vague. [Authority.] However, '[a] statute is not vague when the meaning of the words used can be fairly ascertained by reference to similar statutes, other judicial determinations, referenced common law, or to the dictionary, or if the words themselves have a common and generally accepted meaning.' *State v. Donner,* 243 N.W.2d 850, 853 (Iowa 1976).

"Nondramatic voice" is a simple phrase which we think is commonly understood. The dictionary meaning of "laudatory" is "expressing praise." Websters New International Dictionary, third ed. (1964). The terms are not vague.

■ It is unnecessary to discuss defendants' counterclaim which asks that we declare our rule to be unconstitutional. Because we find that the rule withstands defendants' constitutional challenge, we order that a writ issue, restraining defendants from continuing to place the advertisements.

WRIT ISSUED.

All Justices concur except LARSON and McCORMICK, JJ., who dissent.

LARSON, Justice (dissenting).

I believe the laundry list of allowable advertising *content* is unnecessarily restrictive because it prohibits dissemination of basic information necessary for an informed judgment about the selection of an attorney and the protection of basic legal rights. As to the restrictions on *technique,* these are in fact a prescription for dullness, prohibiting all background music, dramatization, and other methods of stimulating viewer interest. It is undisputed that the effect of these limitations on technique is to substantially diminish the effectiveness of any television advertising. The combined effect of the rules is to inhibit dissemination of relevant information without a showing of a substantial state interest. This violates the free speech clause of the first amendment.

At the outset, we as lawyers must accept the reality that despite this perceived assault on the "professionalism" of the bar, and despite the exemption of commercial speech previously existing, lawyer advertising is here, and it is here in constitutional dimensions. It is here because of the Supreme Court interpretation of the free speech clause of the first amendment of the United States Constitution in both *Bates v. State Bar of Arizona,* 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977) and *In re R.M.J.,* 455 U.S. 191, 102 S.Ct. 929, 71 L.Ed.2d 64 (1982).

First amendment protection of commercial speech, while not as extensive as that accorded other forms of speech, is nevertheless broad in its reach, and the principles to be applied are quite straightforward. *Central Hudson* sets forth the four-part test we must apply:

(1) Do the ads concern an unlawful activity, or are they misleading? If the answer to either question is in the affirmative, first amendment protection is not allowed. If the answers to both questions are in the negative, the following tests apply:

(2) Is the governmental interest, asserted through these disciplinary rules, substantial?

(3) Does this regulation directly advance that governmental interest?

(4) Is the regulation more extensive than necessary to serve that interest? *See Central Hudson Gas & Electric Corp. v. Public Service Commission,* 447 U.S. 557, 566, 100 S.Ct. 2343, 2351, 65 L.Ed.2d 341, 351 (1980).

Although the majority recognizes the *Central Hudson* test, the opinion does not make it clear whether first amendment protection is unavailable for the defendant's advertisements because they are "misleading" under the first segment of the test or whether there is a substantial state interest which is directly advanced by those regulations under steps two and three of the *Central Hudson* test. I believe the majority is on shaky ground under either approach.

I. *Are the Advertisements "Misleading."*

It is interesting to note that the Committee's own expert, Dr. Haynes, testified the ads were not in fact misleading, and that his survey group, which had actually viewed the ads, agreed. The Committee's argument that they are deceitful is, in fact, an argument that they *might* mislead the viewer with respect to possible responsibility for court costs and with respect to the extent of the experience of Humphrey and Haas, which the Committee argues is minimal.

The majority specifically concludes that the *chance* of deceit is sufficient to deny first amendment protection "[w]ithout suggesting that the advertisements here were deceitful" because "in the medium defendants chose [television] the public could well be misled by them." It improvises on the four-prong test of *Central Hudson* by saying that because television is the medium, a mere *chance* of deceit is sufficient. That theory, however, is not suggested in *Central Hudson* nor in any other case.

The majority draws support for this theory solely from language taken from *Bates* which, the majority says "seems to clearly

have recognized the electronic use of [sound, visual displays, and dramatization] as potentially misleading." *Bates*, however, did not say there was more potential for abuse in electronic advertising, only that "the special problems of advertising on the electronic media will warrant special consideration." *Bates*, 433 U.S. at 384, 97 S.Ct. at 2709, 53 L.Ed.2d at 836. Neither *Bates* nor the case it cited on this issue even mentioned any increased potential of the electronic media for misleading the public. *See Capital Broadcasting Co. v. Mitchell*, 333 F.Supp. 582 (D.C.1971), *aff'd sub nom, Capital Broadcasting Co. v. Kleindiest*, 405 U.S. 1000, 92 S.Ct. 1289, 31 L.Ed.2d 472 (1972). *Capital Broadcasting* illustrates the sort of "special problems" referred to in *Bates* in connection with television advertising. *Capital Broadcasting* justified a different rule for television advertising, not because it was likely to be misleading, but because it was nonselective. In effect, television was thought to be reaching too *large* an audience; children, who were being exposed to intensive cigarette advertising, were considered likely to be adversely affected by it.

Television advertising by lawyers, on the other hand, cannot be considered objectionable merely because television is nonselective, and the rationale of *Capital Broadcasting* is inapposite. Yet, the majority seizes on *Bates'* "special problems" language used in connection with the Court's reference to *Capital Broadcasting* as authority for its broad assertion of power in restricting television advertising. I do not think this language of *Bates* was intended to grant such a broad exercise of state power.

I believe the Supreme Court has actually made it clear that regardless of the medium used, advertising must be more than "possibly" misleading in order to be denied first amendment protection. In *In re R.M.J.*, 455 U.S. 191, 102 S.Ct. 929, 71 L.Ed.2d 64 (1982), the Court addressed the matter of untruthful advertising:

> [T]he Court has made clear in Bates and subsequent cases that regulation—and

imposition of discipline—are permissible where the particular advertising is inherently *likely* to deceive or where the record indicates that a particular form or method of advertising *has in fact* been deceptive.

*Id.* at 202, 102 S.Ct. at 937, 71 L.Ed.2d at 73–74 (Emphasis added.)

A further indication that more than a possibility of deceit would be required is found in *R.M.J.*'s discussion of two prior cases in which first amendment protection was denied for professional advertising or solicitation. In discussing *Ohralik v. Ohio State Bar Association*, 436 U.S. 447, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978), the *R.M.J.* Court said "the possibility of 'fraud, undue influence, intimidation, overreaching, and other forms of vexatious conduct' was *so likely* in the context of in-person solicitation" that such solicitation could be prohibited. *R.M.J.*, 455 U.S. at 202, 102 S.Ct. at 937, 71 L.Ed.2d at 74. (Emphasis added.) Similarly, in discussing *Friedman v. Rogers*, 440 U.S. 1, 99 S.Ct. 887, 59 L.Ed.2d 100 (1979), the Court noted that first amendment protection on the use of trade names by Texas optometrists could be prohibited "in view of the *considerable history* in Texas of deception and abuse worked upon the consuming public through the use of trade names." *R.M.J.*, 455 U.S. at 202, 102 S.Ct. at 937, 71 L.Ed.2d at 74. (Emphasis added.)

The Court in *R.M.J.*, after discussing *Ohralik* and *Friedman*, summarized the rule: "[W]hen the particular content or method of the advertising suggests that it is *inherently misleading or when experience has proven that in fact such advertising is subject to abuse*, the states may impose appropriate restrictions." *R.M.J.*, 455 U.S. at 203, 102 S.Ct. at 937, 71 L.Ed.2d at 74. *R.M.J.* involved printed advertising. There is no indication that a different rule would apply to television advertising, yet the Committee does not even attempt to meet the test.

Even if I were to accept the plaintiff's possibility-of-deceit argument, which I do not, I believe the record here still falls

short of establishing any reasonable likelihood that this would happen.

The majority points to two aspects of the advertisements which it claims "might well be" misleading: (1) the statement that certain cases will be handled "on a percentage" basis without mention of court costs might be construed as an offer of "cost-free" services according to the majority; and (2) the advertisements could be construed as a claim of expertise by Humphrey and Haas which in fact is belied by their lack of actual experience.

As to the cost issue, it is true the advertisements state that fees will be assessed on "a percentage basis" (without stating a percentage rate) but do not mention court costs. To require a statement concerning costs, however, would go beyond our own advertising rules, which merely require it in the event the ad specifies a contingent fee rate. Even then the advertisement is merely required to disclose "whether percentages are computed before or after deduction of costs." *See* DR2–101(C). Here, the defendants represent no contingency rate at all, only that the fee would be "a percentage." Significantly, also, DR2–101(C) allows a lawyer to advertise "[f]ixed fees or range of fees for specific legal services" without a caveat about costs, despite the fact that many of the "specific legal services" listed, such as dissolutions, bankruptcies, and several real estate services, would necessarily involve either court costs or recording fees.

The Supreme Court, moreover, has apparently not considered a cost caveat to be necessary for a full disclosure on fees. *See, e.g., In re R.M.J.*, 455 U.S. at 194, n. 3, 102 S.Ct. at 933, n. 3, 71 L.Ed.2d at 68, n. 3 (fees for "routine" legal services may be advertised; no mention of court costs).

As a practical matter, the subject of court costs, affected by the extent of discovery and a myriad of other factors, is so complex as to make it impractical to explain in a thirty-second advertisement. (Testimony showed a thirty-second ad to consist of only about sixty words). Furthermore, any lack of understanding about

this matter, or any other matter relevant to the terms of a lawyer's employment, would logically be resolved at the initial conference, which, in this case, was advertised as being free of cost. *See Bates*, 433 U.S. at 373, n. 28, 97 S.Ct. at 2704, n. 28, 53 L.Ed.2d at 829, n. 28 (1977).

I believe the majority's conclusion that the advertisements overstated the lawyers' qualifications is also without support in the evidence. While the record revealed that these were young lawyers just developing a law practice, there is no evidence, nor even a claim, that they were in fact not qualified. While they lacked the experience of many older lawyers, they did have some experience in each of the areas listed, and the evidence showed they possessed above average academic qualifications. The Committee and the majority seem to equate qualification with experience, and there is simply no direct correlation. I believe the claim that this could "well be" false and misleading is plainly without support.

## II. *The Public Interest Argument.*

If advertising concerns a lawful activity and is not misleading under the *Central Hudson* test, a state may restrict only if (1) the governmental interest is substantial; (2) the regulation directly advances that governmental interest; and (3) the restriction is no more extensive than necessary to serve that interest. *Central Hudson*, 447 U.S. at 566, 100 S.Ct. at 2350, 65 L.Ed.2d at 351. I believe the restrictions imposed in this case fail that test because the Committee has not made the necessary showing of a substantial state interest.

The majority concludes that the state-interest issue is only secondary, stating "[i]t is perhaps unnecessary, under our analysis, to explore the state interests involved." The "analysis" which the majority says makes it unnecessary to address the issue is apparently that the advertisements are actually misleading under the first prong of the *Central Hudson* test, therefore not subject to any first amendment protection regardless of a supporting state interest.

*See Central Hudson,* 447 U.S. at 563, 100 S.Ct. at 2350, 65 L.Ed.2d at 349.

As I have already noted, however, the ads are not even claimed to be actually misleading, and any risk of possible misleading is minimal—certainly not sufficient to justify denial of first amendment protection without even considering the state interest. I believe, in fact, analysis of the state interest is the pivotal issue in this case.

What is that interest? The majority identifies only one in support of the restrictive rules: "fostering rational, intelligent, and voluntary decision making in determining the need for legal services and selecting a lawyer," citing *Bates* and *R.M.J.*

It is interesting, however, that both *Bates* and *R.M.J.* used this language to expand the scope of lawyer advertising, not to throttle it.

Moreover, there is a strong state interest in what is essentially a by-product of attorney advertising. This is the need for members of the public to be informed about the nature of their legal rights and the means of pursuing them. As the Supreme Court has said, it would be unusual to meet the need for more informed judgments by reducing the scope of available information:

> Advertising does not provide a complete foundation on which to select an attorney. But it seems peculiar to deny the consumer, on the ground that the information is incomplete, at least some of the relevant information needed to reach an informed decision.... Moreover, the argument assumes that the public is not sophisticated enough to realize the limitations of advertising, and that the public is better kept in ignorance than trusted with correct but incomplete information. We suspect the argument rests on an underestimation of the public. In any event, we view as dubious any justification that is based on the benefits of public ignorance.

*Bates,* 433 U.S. at 374–75, 97 S.Ct. at 2704, 53 L.Ed.2d at 829–30. In providing information for the formation of an informed judgment, it seems to me that it is prefera-ble to provide an excess of information, rather than too little. Viewers are sophisticated enough to accept or reject it as they see fit.

Broad areas of information necessary to an informed judgment are prohibited by our rules. In the present case, the advertisements inform the viewer that, if one is hurt through the negligence of others, he should see a lawyer and imply that recovery for losses might be obtained. One advertisement points out that legal rights may be lost by failure to talk to a lawyer. These and many other types of information including, most obviously, such matters as statutes of limitation, the early filing requirements of our tort claims act, and the problems of uninformed releases of claims are all of great importance to an informed decision of the viewer. Yet these, and all other items of general information on the rights of litigants are prohibited by the rules, because they are not included in the "laundry list" of contents.

I believe the state interest served by this type of information far outweighs any interest in denying it. *Bates* and *R.M.J.* make it clear that present methods of delivering legal services are ineffective. In *Bates,* the court said:

> The absence of advertising may be seen to reflect the profession's failure to reach out and serve the community: Studies reveal that many persons do not obtain counsel even when they perceive a need because of the feared price of services or because of an inability to locate a competent attorney. Indeed, cynicism with regard to the profession may be created by the fact that it long has publicly eschewed advertising, while condoning the actions of the attorney who structures his social or civic associations so as to provide contacts with potential clients.

*Id.* at 370–71, 97 S.Ct. at 2702, 53 L.Ed.2d at 827–28.

American Bar Association statistics cited in *Bates* show that the "middle 70% of our population is not being reached or served

adequately by the [legal] profession." *Id.* at 376, 97 S.Ct. at 2705, 53 L.Ed.2d at 831.

In Iowa, a recent study shows that there is only one Legal Services Corporation lawyer for each 8700 eligible recipients. Equal Access to Services Study, Legal Services Corporation of Iowa (1984). Moreover, many of the traditional points of contact between lawyers and potential clients, such as the country club or Rotary Club are simply not viable sources of preliminary legal information for a great segment of our population.

I believe the thrust of the Rule 2–101 laundry list largely misses the point of public information. What difference does it make to potential litigants when the lawyer was born, the legal fraternities, societies or bar association of which the lawyer is a member (especially since membership usually is not based on any required level of professional competency) or whether the lawyer has had military service? This is relatively unimportant information, in view of the possibility that litigants might lose their claims, through lack of information, to a statute of limitation or other legal impediment as to which they remain ignorant.

I believe our rules, insofar as they ban advertising which is false or misleading, are valid. This is basically the model rule of the American Bar Association[1] and the rule of most states. Beyond that, I believe the additional restrictions of our rules fail the state interest test and are therefore invalid.

I believe, moreover, that the model rule illustrates the "less restrictive" means of control alluded to in *Central Hudson,* and that the Committee has failed to show that they would not be effective here. For that additional reason, I believe the restrictions imposed here fail the test of constitutionality.

I would dissolve the injunction and grant judgment for the defendants on their counterclaim.

McCORMICK, J., joins this dissent.

---

1. RULE 7.1 Communications Concerning a Lawyer's Services

A lawyer shall not make a false or misleading communication about the lawyer or the lawyer's services. A communication is false or misleading if it:
(a) contains a material misrepresentation of fact or law, or omits a fact necessary to make the statement considered as a whole not materially misleading;
(b) is likely to create an unjustified expectation about results the lawyer can achieve, or states or implies that the lawyer can achieve, or states or implies that the lawyer can achieve results by means that violate the rules of professional conduct or other law; or
(c) compares the lawyer's services with other lawyers' services, unless the comparison can be factually substantiated.