Alexander v. Cahill

**UNITED STATES COURT OF APPEALS**

**FOR THE SECOND CIRCUIT**

August Term, 2008

(Argued:   January 22, 2009                    Decided:  March 12, 2010 )

Docket Nos. 07-3677-cv (L), 07-3900-cv (XAP)

———————————————————

JAMES L. ALEXANDER, ALEXANDER & CATALANO LLC, and PUBLIC CITIZEN, INC.,

*Plaintiffs-Appellees-Cross-Appellants*,

– v. –

THOMAS J. CAHILL, in his official capacity as Chief Counsel for the Departmental Disciplinary Committee for the Appellate Division of the New York Court of Appeals, First Department, DIANA MAXFIELD KEARSE, in her official capacity as Chief Counsel for the Grievance Committee for the Second and Eleventh Judicial Districts, GARY L. CASELLA, in his official capacity as Chief Counsel for the Grievance Committee for the Ninth Judicial District, RITA E. ADLER, in her official capacity as Chief Counsel for the Grievance Committee for the Tenth Judicial District, MARK S. OCHS, in his official capacity as Chief Attorney for the Committee on Professional Standards for the Appellate Division of the New York Court of Appeals, Third Department, ANTHONY J. GIGLIOTTI, in his official capacity as acting Chief Counsel for the Grievance Committee for the Fifth Judicial District, DANIEL A. DRAKE, in his official capacity as acting Chief Counsel for the Grievance Committee for the Seventh Judicial District and VINCENT L. SCARSELLA, in his official capacity as acting Chief Counsel for the Grievance Committee for the Eight Judicial District,

*Defendants-Appellants-Cross-Appellees*.

———————————————————

Before: WALKER and CALABRESI, *Circuit Judges*.[1]

---

[1] The Honorable Sonia Sotomayor, originally a member of the panel, was elevated to the Supreme Court on August 8, 2009.  The two remaining members of the panel, who are in agreement, have determined the matter.  *See* 28 U.S.C. 46(d); Local Rule 0.14(d); *United States v. Desimone*, 140 F.3d 457 (2d Cir. 1998).

Defendants below, representing New York's Appellate Division, appeal from the decision of the United States District Court for the Northern District of New York (Scullin, *J.*), granting summary judgment to Plaintiffs and invalidating content-based restrictions on attorney advertising in New York State. Plaintiffs below cross-appeal from so much of the District Court's opinion as granted summary judgment to Defendants, upholding a thirty-day moratorium on targeted solicitation following a specific incident. The District Court's opinion is AFFIRMED in part and REVERSED in part.

GREGORY A. BECK (Brian Wolfman, on the brief), Public Citizen Litigation Group, Washington, D.C., *for Plaintiffs-Appellees-Cross-Appellants*.

OWEN DEMUTH, Assistant Solicitor General (Barbara D. Underwood, Solicitor General, Andrew D. Bing, Deputy Solicitor General, and Peter H. Schiff, Senior Counsel, *of counsel*), *for* Andrew M. Cuomo, Attorney General of the State of New York, Albany, N.Y., *for Defendants-Appellants-Cross-Appellees*.

David G. Keyko and Ryan G. Kriger, Pillsbury Winthrop Shaw Pittman LLP, New York, N.Y., *for amicus curiae Bar of the City of New York in support of Plaintiffs-Appellees-Cross-Appellants.*

Kathryn Grant Madigan, New York State Bar Association, Albany, N.Y., and Bernice K. Leber (Jennifer L. Bougher and Ali M. Arain, *on the brief*), Arent Fox LLP, New York, N.Y., *for amicus curiae New York State Bar Association in support of Defendants-Appellants-Cross-Appellees.*

CALABRESI, *Circuit Judge*:

New York's Appellate Division adopted new rules prohibiting certain types of attorney advertising and solicitation, which were to take effect February 1, 2007. The new rules barred, *inter alia*, testimonials from clients relating to pending matters, portrayals of judges or fictitious law firms, attention-getting techniques unrelated to attorney competence, and trade names or nicknames that imply an ability to get results. The amendments also established a thirty-day moratorium for targeted solicitation following a specific incident, including targeted ads on

television or in other media. Plaintiffs, a New York attorney, along with his law firm and a not-for-profit public interest organization, challenged these provisions as violating the First Amendment. The District Court agreed in part—it declared most of the content-based rules unconstitutional, while upholding the thirty-day moratorium. Both Plaintiffs and Defendants timely appealed from portions of the District Court's decision adverse to them. For the reasons that follow, we conclude that the District Court properly granted summary judgment to Plaintiffs with respect to the content-based advertising restrictions, with the exception of the prohibition on portrayals of fictitious law firms. We likewise conclude that the District Court properly granted summary judgment to Defendants with respect to the thirty-day moratorium. Accordingly, we affirm the District Court's opinion in large part, and reverse in part.

**BACKGROUND**

*A. The Parties*

The Plaintiffs-Appellees-Cross-Appellants ("Plaintiffs") are an individual (James Alexander), a law firm (Alexander & Catalano), and a not-for-profit consumer rights organization (Public Citizen). Alexander is the managing partner of Alexander & Catalano, a personal injury law firm with offices in Syracuse and Rochester. Alexander & Catalano use various broadcast and print media to advertise. Prior to the adoption of New York's new attorney advertising rules, the firm's commercials often contained jingles and special effects, including wisps of smoke and blue electrical currents surrounding the firm's name. Firm advertisements also featured dramatizations, comical scenes, and special effects—for instance, depicting Alexander and his partner as giants towering above local buildings, running to a client's house so quickly they appear as blurs, and providing legal assistance to space aliens. Another advertisement depicted a judge in the courtroom and stated that the judge is there "to

make sure [the trial] is fair." The firm's ads also frequently included the firm's slogan, "heavy hitters," and phrases like "think big" and "we'll give you a big helping hand." To date, no disciplinary actions have been brought against the firm or its lawyers based on firm advertising. The new rules, however, caused the firm to halt its advertisements for fear of such action.

Plaintiff Public Citizen is a D.C. not-for-profit corporation, with approximately 100,000 members nationwide, including roughly 10,000 in New York. Public Citizen Litigation Group is a division of Public Citizen that conducts, *inter alia*, *pro bono* constitutional litigation in state and federal courts on behalf of its clients. These organizations maintain a website and various blogs, and participate in distributing educational materials on various legal issues to the public.

Defendants-Appellants-Cross-Appellees ("Defendants") are the chief counsels or acting chief counsels of the disciplinary committees whose jurisdiction lies within each of the four Judicial Departments of the New York Supreme Court, Appellate Division. The Appellate Division is authorized to discipline attorneys for professional misconduct. *See* N.Y. Judiciary Law § 90(2) (McKinney 2009). Pursuant to this authority, the four presiding justices of each of New York's four departments are responsible for adopting disciplinary rules, which set the parameters for professional conduct and provide for the discipline of attorneys violating the rules. The departments have, in turn, appointed the disciplinary committees of which Defendants are a part. These committees undertake investigations into complaints of attorney misbehavior. Following an investigation, Defendants are empowered to take a number of actions with respect to a complaint, including issuing a letter of caution or recommending that formal disciplinary proceedings be started. When formal disciplinary proceedings are deemed warranted, Defendants begin such proceedings in the Appellate Division. Accordingly, Defendants are

responsible for enforcing the New York Code of Professional Responsibility and the attorney disciplinary rules promulgated thereunder.

*B. The Appellate Division's Adoption of the New Rules*

In June 2006, the presiding justices of the four departments of the Appellate Division approved for comment draft amendments to the then-existing rules. A press release explained that the new rules were designed to protect consumers "against inappropriate solicitations or potentially misleading ads, as well as overly aggressive marketing," and to "benefit the bar by ensuring that the image of the legal profession is maintained at the highest possible level." Following a comment period, the presiding justices issued final rules. These rules were set to take effect on February 1, 2007.

We consider below a subset of these final rules, which we subdivide into two categories. The first group of amendments imposes a series of content-based restrictions:

N.Y. Comp. Codes R. & Regs., tit. 22, § 1200.50(c):

(c) An advertisement shall not:

(1) include an endorsement of, or testimonial about, a lawyer or law firm from a client with respect to a matter that is still pending . . .

(3) include the portrayal of a judge, the portrayal of a fictitious law firm, the use of a fictitious name to refer to lawyers not associated together in a law firm, or otherwise imply that lawyers are associated in a law firm if that is not the case . . .

(5) rely on techniques to obtain attention that demonstrate a clear and intentional lack of relevance to the selection of counsel, including the portrayal of lawyers exhibiting characteristics clearly unrelated to legal competence . . .

(7) utilize a nickname, moniker, motto or trade name that implies an ability to obtain results in a matter.[2]

---

[2] At the time this action was argued, these provisions appeared at N.Y. Comp. Codes R. & Regs., tit. 22, § 1200.6(c). They appear at their present location without change.

An attorney "advertisement" is defined by N.Y. Comp. Codes R. & Regs., tit. 22, § 1200.0(a) as "any public or private communication made by or on behalf of a lawyer or law firm about that lawyer or law firm's services, the

-5-

The second group of amendments imposes a thirty-day moratorium on certain communications following a personal injury or wrongful death event:

N.Y. Comp. Codes R. & Regs., tit. 22, § 1200.52: Solicitation and Recommendation of Professional Employment

(b) For purposes of this Rule, "solicitation" means any advertisement initiated by or on behalf of a lawyer or law firm that is directed to, or targeted at, a specific recipient or group of recipients, or their family members or legal representatives, the primary purpose of which is the retention of the lawyer or law firm, and a significant motive for which is pecuniary gain. It does not include a proposal or other writing prepared and delivered in response to a specific request of a prospective client.

(e) No solicitation relating to a specific incident involving potential claims for personal injury or wrongful death shall be disseminated before the 30th day after the date of the incident, unless a filing must be made within 30 days of the incident as a legal prerequisite to the particular claim, in which case no unsolicited communication shall be made before the 15th day after the date of the incident.

N.Y. Comp. Codes R. & Regs., tit. 22 § 1200.36: Communication after Incidents Involving Personal Injury or Wrongful Death

(a) In the event of a specific incident involving potential claims for personal injury or wrongful death, no unsolicited communication shall be made to an individual injured in the incident or to a family member or legal representative of such an individual, by a lawyer or law firm, or by any associate, agent, employee or other representative of a lawyer or law firm representing actual or potential defendants or entities that may defend and/or indemnify said defendants, before the 30th day after the date of the incident, unless a filing must be made within 30 days of the incident as a legal prerequisite to the particular claim, in which case no unsolicited communication shall be made before the 15th day after the date of the incident.

(b) An unsolicited communication by a lawyer or law firm, seeking to represent an injured individual or the legal representative thereof under the circumstance described in paragraph (a) shall comply with [§ 1200.52(e)].[3]

primary purpose of which is for the retention of the lawyer or law firm. It does not include communications to existing clients or other lawyers."

3 At the time this action was argued, these provisions appeared at N.Y. Comp. Codes R. & Regs., tit. 22, §§ 1200.8 and 1200.41, respectively.  Former § 1200.8 appears unchanged at § 1200.52.  Former § 1200.41, which now

*C. The Present Action and District Court Decision*

Plaintiffs filed their complaint on February 1, 2007, the date on which the new rules were to take effect. They sought declaratory and injunctive relief from several of the new rules, including all those set forth above. Plaintiffs contended that these rules infringed their First Amendment rights because the rules prohibited "truthful, non-misleading communications that the state has no legitimate interest in regulating." Plaintiffs moved for a preliminary injunction against enforcement of the rules, and Defendants moved to dismiss the complaint for, *inter alia*, lack of standing. The District Court (Scullin, *J.*) reserved decision on Plaintiffs' motion and denied Defendants' cross-motion. *Alexander v. Cahill*, No. 5:07-cv-117, 2007 U.S. Dist. LEXIS 29823 (N.D.N.Y. Apr. 23, 2007). Thereafter, the parties stipulated to a set of facts and exhibits that became the basis for competing motions for summary judgment.

On July 23, 2007, the District Court filed its Memorandum-Decision and Order granting partial summary judgment to Plaintiffs and partial summary judgment to Defendants. *Alexander v. Cahill*, 634 F.Supp.2d 239 (N.D.N.Y. 2007). Principally, the District Court found unconstitutional the disputed provisions of § 1200.50(c) set forth above, while concluding that the thirty-day moratorium provisions survived constitutional scrutiny.[4]

Throughout its opinion, the District Court applied the test for commercial speech set forth in *Central Hudson*, which considers whether (1) the speech is protected by the First Amendment; (2) there is a substantial state interest to be achieved by the restriction; (3) the restriction materially advances the state interest; and (4) the restriction is narrowly drawn. *See Central*

appears at § 1200.36, has changed by shifting between subsections (a) and (b) the class of lawyers and law firms it addresses. The parties have not briefed the relevance, if any, of this change. We accordingly read the change to be immaterial to this appeal.

4 The District Court made several additional rulings that are not at issue in these appeals. Most importantly, the District Court accepted a narrowing construction of the amendments as inapplicable to non-commercial attorney communications. On this basis, the District Court granted Defendants' summary judgment motion as to Plaintiffs' claims regarding application of the rules to non-commercial speech. *Alexander*, 634 F.Supp.2d at 255-56.

*Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 564-66 (1980). The District Court rejected Defendants' claim that "the State of New York could ban attorney advertising that was 'irrelevant, unverifiable, [and] non-informational' without reference to the *Central Hudson* test." *Alexander*, 634 F.Supp.2d at 246 n.4. It concluded: "Defendants have provided no legal support for this proposition, and the Court finds none. Although these characteristics may be evidence that an advertisement is misleading, they do not by themselves constitute a justification for banning commercial speech in the form of attorney advertising." *Id.*

Turning to the amendments that restricted potentially misleading advertisements, including the disputed provisions of § 1200.50(c), the District Court found that Defendants' stated interest in protecting consumers from misleading attorney advertisements was a substantial one. *Id.* at 247-48. Under *Central Hudson*'s penultimate prong, which requires that the regulation materially advance the state's interest, however, the District Court concluded that the record was "notably lacking." *Id.* at 248. The District Court gave considerable weight to Defendants' reliance on the New York State Bar Association's Task Force Report on Lawyer Advertising, but concluded that the Report provided sufficient support only for two amendments: the prohibition on the portrayal of judges in attorney advertisements, and the prohibition on the use of trade names that imply an ability to get results. *Id.* at 248-49. As to the remaining disputed portions of § 1200.50(c), the District Court emphasized that the Task Force Report had recommended disclosure and invigorated enforcement of existing rules, rather than any new content-based restrictions. *Id.* at 249. Finally, the District Court found that the two amendments that materially advanced New York's interest in preventing misleading advertising did not do so in a sufficiently narrowly tailored fashion. The District Court criticized Defendants for failing "to produce any evidence that measures short of categorical bans would not have sufficed to

remedy the perceived risks of such advertising being misleading." *Id.* at 250. The District Court therefore concluded that all of the disputed portions of § 1200.50(c) failed the *Central Hudson* test.

With regard to the thirty-day moratorium on contacting victims, the District Court reached the opposite conclusion. The District Court recognized that New York's moratorium is broader than the Florida moratorium sustained by the Supreme Court in *Florida Bar v. Went For It, Inc.*, 515 U.S. 618 (1995). Florida's moratorium was limited to direct-mail solicitation, while New York's provisions "extend by their plain language to television, radio, newspaper, and website solicitations that are directed to or targeted at a specific recipient or group of recipients." *Alexander*, 634 F.Supp.2d at 253. Nonetheless, the District Court concluded that New York's moratorium materially advanced state interests in protecting the privacy of citizens and guarding against the indignity of being solicited for legal services immediately following a personal injury or a wrongful death event, and did so in a reasonably proportionate manner. *Id.* at 253-55. The District Court relied on "an emerging consensus among authorities, state and federal, regarding the desirability of some form of moratorium," citing the Task Force Report's review of direct-mail moratoria in Florida and eight other states, the federal airline disaster moratorium (which prohibits not only direct-mail solicitation, but "unsolicited communications" generally for a forty-five day period, 49 U.S.C. § 1136), and the Supreme Court's opinion in *Florida Bar*. *Alexander*, 634 F.Supp.2d at 254. The District Court also noted "the existence of 'ample alternative channels' for the public to receive information concerning legal services during the moratorium period—namely, general advertisements in any media, provided they do not reference a specific tragedy." *Id.* (quoting *Florida Bar*, 515 U.S. at 633-34).

**DISCUSSION**

This case calls on us once again to assess the scope of First Amendment protection accorded to commercial speech, and the measure of evidence a state must present in regulating such speech. Because this action was resolved on summary judgment, we review the District Court's decision *de novo*, drawing all factual inferences in favor of the non-moving party. *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir. 2003).

The Supreme Court has established a four-part inquiry for determining whether regulations of commercial speech are consistent with the First Amendment:

> [1] whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask [2] whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine [3] whether the regulation directly advances the governmental interest asserted, and [4] whether it is not more extensive than is necessary to serve that interest.

*Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 566 (1980).[5]

*A. The Disputed Provisions Regulate Commercial Speech Protected by the First Amendment*

Defendants' appeal challenges the District Court's threshold conclusion as to the first prong of this inquiry—that the First Amendment protects advertising that is irrelevant, unverifiable, and non-informational. Although they do not dispute that New York's thirty-day moratorium provisions regulate protected commercial speech, Defendants argue strenuously to us that New York's content-based restrictions regulate speech that is not entitled to First Amendment protection at all.

---

[5] The Supreme Court has variously described the *Central Hudson* test as having three or four prongs, depending on whether the preliminary inquiry into whether the content to be regulated is protected is counted as a prong. *Compare 44 Liquormart, Inc. v. Rhode Island.*, 517 U.S. 484, 500 n.9 (1996) (describing the test as having four prongs), *with Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 624 (1995) (describing the test as having three prongs). Defendants' appeal focuses, among other things, on whether certain commercial speech is entitled to First Amendment protection at all. Because the three-part locution of the *Central Hudson* test assumes such an inquiry, we adopt the four-part locution throughout.

The Supreme Court first recognized attorney advertising as within the scope of protected speech in *Bates v. State Bar of Arizona*, 433 U.S. 350 (1977), in which the Court invalidated a ban on price advertising for what the Court deemed "routine" legal services. In so doing, the Court reserved the question of whether similar protection would extend to "advertising claims as to the quality of services [that] are not susceptible of measurement or verification." *Id.* at 383.

In the years since *Bates*, the Supreme Court has offered differing, and not always fully consistent, descriptions as to what constitutes protected commercial speech, particularly with respect to attorney advertising. Speaking generally, the Supreme Court has said that states may impose regulations to ensure that "the stream of commercial information flow[s] cleanly as well as freely." *Va. Bd. of Pharmacy v. Va. Citizens Consumer Council*, 425 U.S. 748, 772 (1976). But this Court has nonetheless observed that there are "doctrinal uncertainties left in the wake of Supreme Court decisions from which the modern commercial speech doctrine has evolved. In particular, these decisions have created some uncertainty as to the degree of protection for commercial advertising that lacks precise informational content." *Bad Frog Brewery, Inc. v. N.Y. State Liquor Auth.*, 134 F.3d 87, 94 (2d Cir. 1998)

In the end, we agree with the District Court that, with one exception discussed below, the content-based restrictions in the disputed provisions of § 1200.50(c) regulate commercial speech protected by the First Amendment. In almost every instance, descriptions of the first prong of the *Central Hudson* test are phrased in the negative, and the only categories that *Central Hudson*, and its *sequellae*, clearly excludes from protection are speech that is false, deceptive, or misleading, and speech that concerns unlawful activities. *See, e.g.*, *Florida Bar*, 515 U.S. at 623-24 ("[T]he government may freely regulate commercial speech that concerns unlawful activity or is misleading. Commercial speech that falls into neither of those categories . . . may be regulated

if the government satisfies [*Central Hudson*'s remaining three prongs]." (citation omitted)); *Ibanez v. Fl. Dep't of Bus. & Prof'l Regulation, Bd. of Accountancy*, 512 U.S. 136, 142 (1994) ("[O]nly false, deceptive, or misleading commercial speech may be banned."). The Supreme Court has also emphasized that "States may not place an absolute prohibition on certain types of potentially misleading information . . . if the information also may be presented in a way that is not deceptive." *In re R.M.J.*, 455 U.S. 191, 203 (1982); *see also, e.g.*, *Peel v. Attorney Registration & Disciplinary Comm'n of Ill.*, 496 U.S. 91, 100-01 (1990); *Shapero v. Ky. Bar Ass'n*, 486 U.S. 466, 479 (1988); *Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio*, 471 U.S. 626, 644 (1985). We conclude from these precedents that the *Central Hudson* analysis applies to regulations of commercial speech that is only *potentially* misleading.[6]

The speech that Defendants' content-based restrictions seeks to regulate—that which is irrelevant, unverifiable, and non-informational—is not inherently false, deceptive, or misleading. Defendants' own press release described its proposed rules as protecting consumers against "*potentially* misleading ads." This is insufficient to place these restrictions beyond the scope of First Amendment scrutiny.[7]

There is one exception to this conclusion. Subsection 1200.50(c)(3) prohibits "the portrayal of a fictitious law firm, the use of a fictitious name to refer to lawyers not associated

---

[6] Moreover, in this Court's lead opinion on the matter, we have stated generally, in the context of product advertising, that "minimal information, conveyed in the context of a proposal of a commercial transaction, suffices to invoke the protections for commercial speech, articulated in *Central Hudson*." *Bad Frog Brewery*, 134 F.3d at 97.

[7] Defendants contend that their relevance and verifiability requirements were, in fact, adopted by the Supreme Court by way of summary dismissal. *Comm. on Professional Ethics & Conduct of the Iowa State Bar Assoc. v. Humphrey*, 355 N.W.2d 565 (Iowa 1984), *vacated and remanded*, 472 U.S. 1004 (1985), *after remand*, 377 N.W.2d 643 (Iowa 1985), *appeal dismissed for want of a substantial federal question*, 475 U.S. 1114 (1986). We do not find the Iowa Supreme Court's analysis in *Humphrey* persuasive. And we comment on *Humphrey* also to draw attention to the well-established limits on the precedential value of summary dismissals of this kind. The Supreme Court has long recognized that the precedential value of a summary dismissal is limited to "the precise issues presented and necessarily decided by" the dismissal. *Mandel v. Bradley*, 432 U.S. 173, 176 (1977). Accordingly, we need not conclude that New York's content-restrictions are permissible simply because the Iowa Supreme Court upheld Iowa's regulations summarily following an earlier remand.

together in a law firm, or otherwise imply that lawyers are associated in a law firm if that is not the case." N.Y. Comp. Codes R. & Regs., tit. 22, § 1200.50(c)(3). The District Court invalidated § 1200.50(c)(3) in its entirety. *Alexander*, 634 F.Supp.2d at 249. Plaintiffs acknowledge, however, that they intended to challenge only the first clause of this subsection— prohibiting portrayals of judges—and they do not oppose Defendants' appeal seeking reinstatement of the prohibition on fictitious firms.

The provision prohibiting advertisements including fictitious firms is susceptible to more than one interpretation. But we need not decide whether it would be constitutional to prohibit dramatizations in which an advertising law firm portrays itself arguing against a fictitious opposing counsel. At oral argument, the Attorney General, representing the Defendants, suggested a narrower interpretation of this regulation. He asked that we construe this language as applying only to situations in which lawyers from different firms give the misleading impression that they are from the same firm (i.e., "The Dream Team"). (Oral Arg. ~12:38:25) We accept this interpretation. So read, this portion of § 1200.50(c)(3) addresses only attorney advertising techniques that are actually misleading (as to the existence or membership of a firm), and such advertising is not entitled to First Amendment protection. *See Florida Bar*, 515 U.S. at 623-24. Accordingly, and subject to the above-mentioned construction, we reverse the District Court's invalidation of that portion of § 1200.50(c)(3) that prohibits advertisements that include fictitious firms.

Having concluded that the remainder of the disputed regulations falls within the zone of protected commercial speech, we turn to the rest of the *Central Hudson* test. The Supreme Court has explained that "[c]ommercial speech that is not false or deceptive and does not concern unlawful activities may be restricted only in the service of a substantial governmental interest,

and only through means that directly advance that interest." *Shapero*, 486 U.S. at 472 (quotation marks and alteration omitted). "The party seeking to uphold a restriction on commercial speech carries the burden of justifying it." *Edenfield v. Fane*, 507 U.S. 761, 770 (1993) (quotation marks and alteration omitted). We apply the three remaining prongs of *Central Hudson*, in turn, to each of the two categories of regulations set forth above.

*B.* Central Hudson *and the Content-Based Regulations*

  1. Substantial Interest

    Under the second prong of *Central Hudson*, the State must identify "a substantial interest in support of its regulation[s]." *Florida Bar*, 515 U.S. at 624. "[T]he *Central Hudson* standard does not permit us to supplant the precise interests put forward by the State with other suppositions." *Id*. at 624 (quotation marks omitted). Before the District Court and again on appeal, Defendants proffered a state interest in "prohibiting attorney advertisements from containing deceptive or misleading content." (Appellants' Br. 32) The report by the New York State Bar Association's Task Force on Lawyer Advertising (hereinafter, the "Task Force Report" or "Report"), which the State considered in formulating its new rules and which constitutes the bulk of the record on appeal, indicates that this is a proper and genuinely asserted interest. The Task Force Report identified protecting the public "by prohibiting advertising and solicitation practices that disseminate false or misleading information" as one of its key concerns. (Task Force Report 1-2) This state interest is substantial—indeed, states have a generally unfettered right to prohibit inherently or actually misleading commercial speech. *See, e.g.*, *Edenfield*, 507 U.S. at 769 ("[T]here is no question that [the State's] interest in ensuring the accuracy of commercial information in the marketplace is substantial."); *In re R.M.J.*, 455 U.S. at 207

("States retain the authority to regulate advertising that is inherently misleading or that has proved to be misleading in practice.").  The disputed regulations codified at § 1200.50(c) therefore survive the second prong of the *Central Hudson* analysis.[8]

Defendants also assert an interest in "protecting the legal profession's image and reputation."  (Appellants' Reply 30)  In *Florida Bar*, the Supreme Court recognized a substantial interest "in preventing the erosion of confidence in the [legal] profession."  *Florida Bar*, 515 U.S. at 635.  Defendants explain that their interest in preventing misleading attorney advertising is "inextricably linked to its overarching interest" in maintaining attorney professionalism and respect for the bar.  (Appellants' Reply 30)  This interest also supports the disputed regulations.[9]

2. Materially Advanced

"The penultimate prong of the *Central Hudson* test requires that a regulation impinging upon commercial expression 'directly advance the state interest involved; the regulation may not be sustained if it provides only ineffective or remote support for the government's purpose.'"  *Edenfield*, 507 U.S. at 770 (quoting *Central Hudson*, 447 U.S. at 564).  The state's burden with respect to this prong "is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restrictions will in fact alleviate them to a material degree."  *Florida*

---

[8] Defendants at times assert an interest in "ending attorney advertising that is potentially deceptive or misleading." (Appellants' Br. 36) It is not clear, however, that a state has a substantial interest in prohibiting *potentially* misleading advertising, as opposed to inherently or actually misleading advertising.  "If the protections afforded commercial speech are to retain their force, we cannot allow rote invocation of the words 'potentially misleading' to supplant" the State's burden. *Ibanez*, 512 U.S. at 146 (internal quotation marks and citation omitted).  Moreover, it is unclear what harm *potentially* misleading advertising creates, and the state bears the burden of proving "that the harms it recites are real and that its restrictions will in fact alleviate them to a material degree." *Florida Bar*, 515 U.S. at 626 (quotation marks omitted).  We need not resolve this issue in order to decide this case, and so we leave it for a future case.

[9] In defending the restriction on testimonials by clients with pending matters, Defendants assert a state interest in preserving the integrity of the attorney-client relationship. (Appellants' Br. 39-40)  Defendants did not assert this interest before the District Court, however, and so we do not consider it on appeal. *See Virgilio v. City of New York*, 407 F.3d 105, 116 (2d Cir. 2005) ("In general we refrain from passing on issues not raised below.") (quotation marks omitted).

*Bar*, 515 U.S. at 626 (quotation marks omitted). Moreover, "[i]f the protections afforded commercial speech are to retain their force, we cannot allow rote invocation of the words 'potentially misleading' to supplant" this burden. *Ibanez*, 512 U.S. at 146 (internal quotation marks and citation omitted).

Invalidating a regulation of commercial speech for lack of sufficient evidence under this prong of *Central Hudson* does not foreclose a similar regulation being enacted validly in the future. Rather, such invalidation returns the matter to the applicable legislating body and "forces [that body] to take a 'second look' with the eyes of the people on it." Guido Calabresi, *Foreward: Antidiscrimination and Constitutional Accountability (What the Bork-Brennan Debate Ignores)*, 105 Harv. L. Rev. 80, 104 (1991); *see also Benjamin v. Jacobson*, 172 F.3d 144, 190 (2d Cir. 1999) (en banc) (Calabresi, *J.*, concurring in the result).

In defending the disputed § 1200.50(c) provisions, Defendants rely on three sources of evidence: (1) "history, consensus, and simple common sense," *Florida Bar*, 515 U.S. at 628 (quotation marks omitted), including regulations of attorney advertising in other states; (2) existing and unchallenged rules already in New York's Code of Professional Responsibility targeting advertising similar to that targeted by the new amendments; and (3) the New York State Bar Association's Task Force Report. Defendants have not submitted any statistical or anecdotal evidence of consumer problems with or complaints of the sort they seek to prohibit. Nor have they specifically identified any studies from other jurisdictions on which the state relied in implementing the amendments. *See Alexander*, 634 F.Supp.2d at 248. Against this background, we test each of the disputed § 1200.50(c) provisions.

*a. Subsection 1200.50(c)(1): Client Testimonials*

This subsection prohibits advertisements that include "an endorsement of, or testimonial about, a lawyer or law firm from a client with respect to a matter that is still pending." N.Y. Comp. Codes R. & Regs., tit. 22, §1200.50(c)(1). The Task Force Report observed that testimonials can be misleading because they may suggest that past results indicate future performance. (Task Force Report 26-27) The Task Force Report, however, did not recommend outright prohibitions of all testimonials on this basis. Instead, as the District Court observed, the Task Force Report "recommended a different approach." *Alexander*, 634 F.Supp.2d at 249. The Report suggested "strengthening the rules governing testimonials to prohibit the use of an actor or spokesperson who is not a member or employee of the advertising lawyer or law firm *absent disclosure thereof.*" (Task Force Report 27) (emphasis added). The Task Force noted, moreover, that "it would be an improper restriction on a client's free speech rights to prohibit client testimonials outright." (*Id.*) The Task Force Report therefore does not support Defendants' assertion that prohibiting testimonials from current clients will materially advance an interest in preventing misleading advertising. Indeed, the Report "contradicts, rather than strengthens, the Board's submissions." *Edenfield*, 507 U.S. at 772.

Nor does consensus or common sense support the conclusion that client testimonials are inherently misleading. Testimonials may, for example, mislead if they suggest that past results indicate future performance—but not all testimonials will do so, especially if they include a disclaimer. The District Court properly concluded that Defendants failed to satisfy this prong of *Central Hudson* with respect to client testimonials.

*b. Subsection 1200.50(c)(3): Portrayal of a Judge*

-17-

This subsection prohibits "the portrayal of a judge." N.Y. Comp. Codes R. & Regs., tit. 22, § 1200.50(c)(3).[10] The Task Force Report observes that "a communication that states or implies that the lawyer has the ability to influence improperly a court" is "likely to be false, deceptive, or misleading." (Task Force Report, App. I, 11) The District Court found this comment to be persuasive evidence that a ban on portrayals of judges would materially advance the State's interest in preventing misleading advertising. We disagree. Although it seems plainly true that implying an ability to influence a court is likely to be misleading, Defendants have failed to draw the requisite connection between that common sense observation and portrayals of judges in advertisements generally. The advertisement in which Alexander & Catalano use the portrayal of a judge, for instance, depicts a judge in the courtroom and states that the judge is there "to make sure [the trial] is fair." This sort of advertisement does not imply an ability to influence a court improperly. It is not misleading; an advertisement of this sort may, instead, be informative. We believe the Task Force Report fails to support Defendants' prohibition on portrayals of judges[11] and conclude that Defendants have not met their burden with respect to the wholesale prohibition of portrayals of judges. This prohibition consequently must fall.

### c. Subsection 1200.50(c)(5): Irrelevant Techniques

This subsection prohibits advertisements that "rely on techniques to obtain attention that demonstrate a clear and intentional lack of relevance to the selection of counsel, including the portrayal of lawyers exhibiting characteristics clearly unrelated to legal competence." N.Y. Comp. Codes R. & Regs., tit. 22, § 1200.50(c)(5). Defendants note that the New York Code of

---

[10] Subsection 1200.50(c)(3) also includes the prohibition on fictitious law firms discussed in section *A* above.

[11] New York's existing rule prohibiting attorneys from stating or implying that they are able "to influence improperly or upon irrelevant grounds any tribunal, legislative body, or public official," N.Y. Comp. Codes R. & Regs., tit. 22, § 1200.58(e)(1), does not support the new rule. On the contrary, this rule mirrors the Task Force Report's remarks, and does not suggest that any and all portrayals of judges imply the capacity to exercise improper influence over a court or other government body.

Professional Responsibility has long declared that the purpose of attorney advertising is to "educate the public to an awareness of legal needs and to provide information relevant to the selection of the most appropriate counsel." (Appellants' Br. 33-34) (quotation marks omitted) Defendants contend that their rule excluding attention-getting techniques unrelated to attorney competence reflects this principle and so materially advances "New York's interest in factual, relevant attorney advertisements." (Appellants' Br. 35)

A rule barring irrelevant advertising components certainly advances an interest in keeping attorney advertising factual and relevant. But this interest is quite different from an interest in preventing misleading advertising. Like Defendants' claim that the First Amendment does not protect irrelevant and unverifiable components in advertising, Defendants here appear to conflate *irrelevant* components of advertising with *misleading* advertising. These are not one and the same. Questions of taste or effectiveness in advertising are generally matters of subjective judgment. Moreover, as the Task Force Report acknowledged, "Limiting the information that may be advertised . . . assumes that the bar can accurately forecast the kind of information that the public would regard as relevant." (Task Force Report, App. I, 8)

Defendants have introduced no evidence that the sorts of irrelevant advertising components proscribed by subsection 1200.50(c)(5) are, in fact, misleading and so subject to proscription. Significantly, the Task Force Report expressly recognized that "communications involving puffery and claims that cannot be measured or verified" were not specifically addressed in its proposed rules, although such communications would already be prohibited "to the extent that they are false, deceptive or misleading." (Task Force Report, App. I, 9) Insofar as the Task Force Report touched on style and advertising gimmicks designed to draw attention, its recommendations were hortatory only. (*See* Task Force Report 70) (quoting the Monroe

County Bar Association Project exhorting—but not requiring—lawyers and firms to include only "factually accurate and objectively verifiable" information in their advertisements, and to minimize devices such as puffery in favor of information "relevant to the thoughtful selection of counsel").

Moreover, the sorts of gimmicks that this rule appears designed to reach—such as Alexander & Catalano's wisps of smoke, blue electrical currents, and special effects—do not actually seem likely to mislead. It is true that Alexander and his partner are not giants towering above local buildings; they cannot run to a client's house so quickly that they appear as blurs; and they do not actually provide legal assistance to space aliens. But given the prevalence of these and other kinds of special effects in advertising and entertainment, we cannot seriously believe—purely as a matter of "common sense"—that ordinary individuals are likely to be misled into thinking that these advertisements depict true characteristics. Indeed, some of these gimmicks, while seemingly irrelevant, may actually serve "important communicative functions: [they] attract[] the attention of the audience to the advertiser's message, and [they] may also serve to impart information directly." *Zauderer*, 471 U.S. at 647. Plaintiffs assert that they use attention-getting techniques to "communicate ideas in an easy-to-understand form, to attract viewer interest, to give emphasis, and to make information more memorable." (Appellees' Br. 36) Defendants provide no evidence to the contrary; nor do they provide evidence that consumers have, in fact, been misled by these or similar advertisements. Absent such, or similar, evidence, Defendants cannot meet their burden for sustaining subsection 1200.50(c)(5)'s prohibition under *Central Hudson*.

*d. Section 1200.50(c)(7): Nicknames, Mottos, and Trade Names*

-20-

This subsection bars advertisements "utiliz[ing] a nickname, moniker, motto or trade name that implies an ability to obtain results in a matter." N.Y. Comp. Codes R. & Regs., tit. 22, § 1200.50(c)(7). We conclude, once again, that the evidence on which Defendants rely fails to support this regulation.

There is a compelling, commonsense argument that, given the uncertainties of litigation, names that imply an ability to obtain results are usually misleading. The Task Force Report made precisely this observation, stating in its recommendations that "the use of dollar signs, the terms 'most cash' or 'maximum dollars,' or like terms that suggest the outcome of the legal matter" is "likely to be false, deceptive or misleading." (Task Force Report, App. I, 11-12) Like its recommendations on irrelevant advertising techniques, however, the Task Force Report did not recommend outright prohibition of all such trade names or mottos—it simply acknowledged that such names are often misleading. Defendants' rule, by contrast, goes further and prohibits such descriptors—including, according to the Attorney General, Alexander & Catalano's own "Heavy Hitters" motto—even when they are not actually misleading. The Task Force Report therefore fails to support Defendants' considerably broader rule.

Nor are we persuaded as to this rule's constitutionality by reference to *Friedman v. Rogers*, 440 U.S. 1 (1979), in which the Supreme Court upheld a prohibition on optometrist trade names. There is doubt as to *Friedman*'s continued vitality. *Friedman* preceded *Central Hudson* by nine years and did not employ *Central Hudson*'s multi-factor First Amendment analysis. As this Court previously observed in *Bad Frog Brewery*, subsequent Supreme Court precedent has undermined *Friedman* and moved in the direction of greater First Amendment protection for "a logo or a slogan that conveys no information, other than identifying the source of the product, but that serves, to some degree, to 'propose a commercial transaction.'" 134 F.3d at 96 (quoting

-21-

*Posadas de Puerto Rico Assocs. v. Tourism Co. of P.R.*, 478 U.S. 328, 340 (1986)).

Accordingly, we decline to rely solely on *Friedman* to uphold § 1200.50(c)(7) given the subsequent precedential developments establishing more specific and demanding burdens of evidence on the state.

Moreover, in *Friedman* itself, the state marshaled substantially stronger and more specific evidence supporting its prohibition on trade names than was done in this case. *See, e.g.*, *Friedman*, 440 U.S. at 13-15. There is a dearth of evidence in the present record supporting the need for § 1200.50(c)(7)'s prohibition on names that imply an ability to get results when the names are akin to, and no more than, the kind of puffery that is commonly seen, and indeed expected, in commercial advertisements generally. Defendants have once again failed to provide evidence that consumers have, in fact, been misled by the sorts of names and promotional devices targeted by § 1200.50(c)(7), and so have failed to meet their burden for sustaining this prohibition under *Central Hudson*.

3. Narrowly Tailored

The final prong of *Central Hudson* asks whether the "fit" between the goals identified (the state's interests) and the means chosen to advance these goals is reasonable; the fit need not be perfect. *Florida Bar*, 515 U.S. at 632. As this Court has explained, "'laws restricting commercial speech . . . need only be tailored in a *reasonable manner* to serve a substantial state interest in order to survive First Amendment scrutiny.'" *N.Y. State Ass'n of Realtors v. Shaffer*, 27 F.3d 834, 842 (2d Cir. 1994) (quoting *Edenfield*, 507 U.S. at 767). Nonetheless, "restrictions upon [potentially deceptive speech] may be no broader than reasonably necessary to prevent the deception." *In re R.M.J.*, 455 U.S. at 203. "[T]he existence of numerous and obvious less-burdensome alternatives to the restriction on commercial speech is certainly a relevant

-22-

consideration in determining whether the 'fit' between ends and means is reasonable." *Florida Bar*, 515 U.S. at 632 (quotation marks and alteration omitted). More precisely, the Supreme Court has emphasized that "States may not place an absolute prohibition on certain types of potentially misleading information . . . if the information also may be presented in a way that is not deceptive." *In re R.M.J.*, 455 U.S. at 203. And the Supreme Court has also affirmed that a state may not impose a prophylactic ban on potentially misleading speech merely to spare itself the trouble of "distinguishing the truthful from the false, the helpful from the misleading, and the harmless from the harmful." *Zauderer*, 471 U.S. at 646.

On this basis, even if we were to find that all of the disputed Section 1200.50(c) restrictions[12] survived scrutiny under *Central Hudson*'s third prong, each would fail the final inquiry because each wholly prohibits a category of advertising speech that is *potentially* misleading, but is not inherently or actually misleading in all cases. Contrary to Defendants' assertions, the fact that New York's rules do also permit substantial information in attorney advertising does not render the disputed provisions any less categorical. Significantly, *Zauderer* deemed a rule barring illustrations a "blanket ban." *Zauderer*, 471 U.S. at 648. And New York's rules prohibiting, *inter alia*, all testimonials by current clients, all portrayals of judges, and all depictions of lawyers exhibiting characteristics unrelated to legal competence are similarly categorical. Because these advertising techniques are no more than potentially misleading, the categorical nature of New York's prohibitions would alone be enough to render the prohibitions invalid.

Moreover, "nowhere does the State cite any evidence or authority of any kind for its contention that the potential abuses associated with the [disputed provisions] cannot be combated

---

[12] Excepting, of course, the prohibition on fictitious firms, which, as explained in section *A* above, addresses inherently misleading advertising that need not be scrutinized under the remaining *Central Hudson* prongs.

by any means short of a blanket ban." *Zauderer*, 471 U.S. at 648; *see also Peel*, 496 U.S. at 109 (noting that the mere potential for misleading "does not satisfy the State's heavy burden of justifying a categorical prohibition"). As the District Court observed, the State could have, for example, required disclaimers similar to the one already required for fictional scenes. *Alexander*, 634 F.Supp.2d at 250; *see* N.Y. Comp. Codes R. & Regs., tit. 22, § 1200.50(c)(4) (fictional scenes). Nothing in the record suggests that such disclaimers would have been ineffective.

The materials in the record show, instead, that disclaimers and other regulations short of content-based bans were in fact suggested. The Task Force "agreed at the outset to deal in practical solutions (*i.e.*, generally strengthening existing disclaimers and requiring further disclosures) without adding content-based restrictions." (Task Force Report 2) Nearly all of the Report's recommendations followed this general rule. And in comments responding to New York's draft rules, the Federal Trade Commission, "which has a long history of reviewing claims of deceptive advertising," *Peel*, 496 U.S. at 105, similarly stated its belief that New York could adequately protect consumers "using less restrictive means such as requiring clear and prominent disclosure of certain information." (Letter from the FTC's Office of Policy Planning, Bureau of Consumer Protection, and Bureau of Economics to Michael Colodner, Office of Court Administration (Sept. 14, 2006))

Defendants have failed to carry their burden with respect to *Central Hudson*'s final prong. We therefore conclude, like the District Court, that the disputed portions of subsections 1200.50(c)(1), (3), (5), and (7) are unconstitutional. In so doing, we return this matter to the Appellate Division, where that body may "take a 'second look' with the eyes of the people on it. Calabresi, *Foreward*, *supra*, at 104.

-24-

*C.* Central Hudson *and the Moratorium Provisions*

Plaintiffs' cross-appeal challenges the District Court's decision upholding New York's time-limited moratorium on solicitation of accident victims or their families. "In cases where a legal filing is required within thirty days, the moratorium is limited to a fifteen-day cooling off period." *Alexander*, 634 F.Supp.2d at 253. New York's moratorium provisions apply to all media through which an attorney might initiate communication "directed to, or targeted at, a specific recipient or group of recipients." N.Y. Comp. Codes R. & Regs., tit. 22, § 1200.52(b).

Consistent with the regulations as written and with counsel's concessions at oral argument, we construe the moratorium provision as inapplicable to (a) broad, generalized mailings (Oral Arg. ~12:06:18); (b) general advertisements conveying an attorney's experience in handling personal-injury suits, even when these advertisements appear near news stories in a newspaper that the attorney knows will be filled with coverage of a particular accident (Oral Arg. ~12:02:38-12:03:00)[13]; or (c) advertisements informing readers of an attorney's past experience with a particular product where that product has caused repeated personal-injury problems (as with the Dalkon Shield advertisement at issue in *Zauderer*). (Oral Arg. ~12:04:11)

We turn now to the remaining *Central Hudson* inquiries relevant to the moratorium provision.

1. State Interest

In *Florida Bar*, the Supreme Court recognized as a substantial state interest "protecting the privacy and tranquility of personal injury victims and their loved ones against intrusive, unsolicited contact by lawyers." *Florida Bar*, 515 U.S. at 624. That case considered a thirty-day

---

13 It is unclear whether the moratorium provisions apply to "meta tagging," a process by which one can insert non-visible HTML code into a website or web advertisement. By use of a meta tag, for example, a lawyer can design a general advertisement that appears when one searches for information regarding a specific incident. The parties have not briefed whether the moratorium provisions prohibit meta tagging, or if they do prohibit meta tagging, whether the prohibition is constitutional. Accordingly, we express no opinion on either question.

moratorium on direct-mail solicitation of accident victims (or their families). This case similarly involves a moratorium on contacting accident victims (and their families). The Task Force Report, which Defendants considered, recommended a limited moratorium because "the cooling off requirement would be beneficial in removing a source of annoyance and offense to those already troubled by an accident or similar occurrence." (Task Force Report 62-63) *Florida Bar* makes clear that Defendants' stated interest is substantial, and the Task Force Report indicates that that interest is genuinely asserted. The moratorium provisions thus meet the requirements of *Central Hudson*'s substantial interest prong.

### 2. Materially Advanced

*Florida Bar* upheld Florida's moratorium rule, which is similar to the New York provisions before us. Several other states have since adopted analogous regulations prohibiting targeted solicitation of accident victims for specific periods of time.[14] The Task Force Report, based in part on the practices of these states, recommended a fifteen-day "cooling-off period" during which direct-mail solicitation of accident victims would be prohibited. (Task Force Report, App. I, 4) New York's moratorium provisions seek to address the same harms that the *Florida Bar* Court recognized in upholding a thirty-day ban on direct-mail solicitations. And the New York provisions seek to address those harms through similar means—a time-limited

---

[14] *See, e.g.*, Ariz. Rules of Prof'l Conduct R. 7.3(b)(3) (prohibiting "written, recorded or electronic communication or by in-person, telephone or real-time electronic" solicitation where "the solicitation relates to a personal injury or wrongful death and is made within thirty (30) days of such occurrence"); Conn. Rules of Prof'l Conduct R. 7.3(b)(5) (imposing a forty-day moratorium on "written or electronic communication concern[ing] an action for personal injury or wrongful death"); Ga. Rules of Prof'l Conduct R. 7.3(a)(3) (imposing a thirty-day moratorium on "written communication concern[ing] an action for personal injury or wrongful death"); La. Rules of Prof'l Conduct R. 7.3(b)(iii)(C) (imposing a thirty-day moratorium on communication "concern[ing] an action for personal injury or wrongful death"); Mo. Rules of Prof'l Conduct 7.3(c)(4) (prohibiting written solicitation, including by e-mail, "concern[ing] an action for personal injury or wrongful death . . . if the accident or disaster occurred less than 30 days prior to the solicitation"); Tenn. Rules of Prof'l Conduct R. 7.3(b)(3) (prohibiting solicitation of "professional employment from a potential client by written, recorded, or electronic communication or by in-person, telephone, or real-time electronic contact" if "the communication concerns an action for personal injury, worker's compensation, wrongful death, or otherwise relates to an accident or disaster involving the person to whom the communication is addressed . . . unless the accident or disaster occurred more than thirty (30) days prior to the mailing or transmission of the communication").

moratorium on targeted solicitation of potential clients. *Florida Bar* makes clear that such means materially advance the state's interest. We conclude, therefore, that Defendants have met their burden under this prong of *Central Hudson*. *See Moore v. Morales*, 63 F.3d 358, 361-62 (5th Cir. 1995) (relying largely on *Florida Bar* in upholding a rule prohibiting attorneys, physicians, and other professionals from soliciting accident victims within thirty days following the accident).

### 3. Narrowly Tailored

Were New York's moratorium provisions limited to direct-mail solicitation, there would be little question as to their constitutionality. *See Falanga v. State Bar of Georgia*, 150 F.3d 1333, 1340-41 (11th Cir. 1998). But New York's moratorium is not so limited. As the District Court recognized, "The moratorium provisions in this case extend by their plain language to television, radio, newspaper, and website solicitations that are directed to or targeted at a specific recipient or group of recipients." *Alexander*, 634 F.Supp.2d at 253.

The Supreme Court has in some circumstances favored a technology-specific approach to the First Amendment. *See United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 813 (2000) ("Cable television, like broadcast media, presents unique problems, which inform our assessment of the interests at stake, and which may justify restrictions that would be unacceptable in other contexts."); *Reno v. ACLU*, 521 U.S. 844, 868 (1997) ("[E]ach medium of expression may present its own problems." (quotation marks and alteration omitted)); *FCC v. League of Women Voters of Ca.*, 468 U.S. 367, 377 (1984) ("[W]e have recognized that 'differences in the characteristics of new media justify differences in the First Amendment standards applied to them.'" (quoting *Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 386 (1969))).[15]

---

[15] *See also Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 74 (1983) ("[T]he special interest of the federal government in regulation of the broadcast media does not readily translate into a justification for regulation of other

Different media may present unique attributes that merit a tailored First Amendment analysis. *But see* Jim Chen, *Conduit-Based Regulation of Speech*, 54 Duke L.J. 1359, 1360 (2005) ("[A] constitutional jurisprudence that minimizes reliance on conduit-based distinctions best protects free speech.").

But the differences among media may or may not be relevant to the First Amendment analysis depending on the challenged restrictions. *Compare Sable Commc'ns of Ca., Inc. v. FCC*, 492 U.S. 115, 128 (1989) ("Unlike an unexpected outburst on a radio broadcast, the message received by one who places a call to a dial-a-porn service is not so invasive or surprising that it prevents an unwilling listener from avoiding exposure to it."), *with Reno*, 521 U.S. at 875–76 (likening regulations seeking to protect minors from harmful material on the Internet to regulations on obscene commercial telephone recordings), *and Sable Commc'ns*, 492 U.S. at 125 (likening obscene commercial telephone recordings to obscene commercial mailings); *cf. Shapero v. Ky. Bar Ass'n*, 486 U.S. 466, 473 (1988) ("Our lawyer advertising cases have never distinguished among various modes of written advertising to the general public.").

In the context before us, we eschew a technology-specific approach to the First Amendment and conclude that New York's moratorium provisions—as we construe them—survive constitutional scrutiny notwithstanding their applicability across the technological spectrum. We focus first on the potential differences among media as to the degree of affirmative action needed to be taken by the targeted recipient to receive the material Plaintiffs seek to send. For many media forms, it is about the same. Thus, to us, the affirmative act of

means of communication."); *FCC v. Pacifica Found.*, 438 U.S. 726, 748 (1978) ("We have long recognized that each medium of expression presents special First Amendment problems."); *S.E. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 557 (1975) ("Each medium of expression . . . must be assessed for First Amendment purposes by standards suited to it . . . .").

walking to one's mailbox and tearing open a letter seems no greater than walking to one's front step and picking up the paper or turning on a knob on a television or radio.

It is true that the Internet may appear to require more affirmative acts on the part of the user in order to recover content (and is therefore perhaps entitled to greater First Amendment protection insofar as users are soliciting information, rather than being solicited). But regardless of whether this characterization was once accurate, it no longer is so. E-mail has replaced letters; newspapers are often read online; radio streams online; television programming is broadcast on the Web; and the Internet can be connected to television. *See* Christopher S. Yoo, *The Rise and Demise of the Technology-Specific Approach to the First Amendment*, 91 Geo. L.J. 245, 248 (2003) ("[T]he impending shift of all networks to packet switched technologies promises to cause all of the distinctions based on the means of conveyance and the type of speech conveyed to collapse entirely."). Furthermore, Internet searches do not bring a user immediately to the desired result without distractions. Advertisements may appear with the user's search results; pop-up ads appear on web pages; and Gmail (Google's e-mail service) creates targeted advertising based on the keywords used in one's e-mail. In such a context, an accident victim who describes her experience in an e-mail might very well find an attorney advertisement targeting victims of the specific accident on her computer screen.[16]

States are increasingly responding to these expanded and expanding roles of the Internet. Several already apply existing attorney professional responsibility rules to electronic and Internet advertisements and solicitations. *See* Amy Haywood & Melissa Jones, *Navigating a Sea of Uncertainty: How Existing Ethical Guidelines Pertain to the Marketing of Legal Services over*

---

[16] At present, Gmail's algorithm for placing targeted advertisements next to e-mail messages omits such ads where an e-mail message mentions a catastrophic event or tragedy. *See* More on Gmail and Privacy, Jan. 2007, http://mail.google.com/mail/help/about_privacy.html. It is by no means certain, however, (a) that Google will continue such a policy, (b) that the algorithm runs without flaws, or (c) that other e-mail providers will exercise similar good taste.

*the Internet*, 14 Geo. J. Legal Ethics, 1099, 1113 (2001) ("[I]t can be assumed that Internet use in the context of legal marketing will generally invoke all ethics rules relating to advertising and solicitation.").[17] Texas and Florida have also added language to their disciplinary rules specifically to address attorney solicitation via the Internet.[18] The New York Task Force Report reached the same conclusion. The Report repeatedly stated that "on-line advertisements and websites are not materially different than typical" printed advertisements, and that the rules should be enforced equally across media. (Task Force Report 54-55) In so doing, the Report "demonstrate[d] that the harms it recites are real and its restriction will in fact alleviate them to a degree." *Florida Bar*, 515 U.S. at 626 (quotation marks omitted).

Accordingly, we conclude that even acknowledging that differences among media may be significant in some First Amendment analyses, they are not so in this case. Three aspects of the Supreme Court's analysis in *Florida Bar* are of particular relevance to our determination that the harms identified in that case, and put forth by Defendants in this case, are just as compelling with respect to targeted attorney advertisements on television, radio, newspapers, and the Internet as they are in justifying a ban on targeted mailings of attorney advertisements.

          *a.  Porcelain Hearts*

The Supreme Court has recognized the particular sensitivity of people to targeted (plaintiff's) attorney advertisements during periods of trauma. To the extent that the attorney advertisements, regardless of the media through which they are communicated, are directed toward the same sensitive people, there is no reason to distinguish among the mode of

---

[17] *See, e.g.*, S.C. Ethics Op. 99-04 (1999) (advertising); Mass. Ethics Op. 98-2 (1998) (advertising and solicitation); Iowa Ethics Op. 96-1 (1996) (advertising); Pa. Ethics Op. 96-17 (1996) (advertising).

[18] *See* Amendments to Rules Regulating the Florida Bar—Advertising Rules, 762 So.2d 392 (Fla. 1999); Tex. Disciplinary Rules of Prof'l Conduct, Interpretive Cmt. 17 (1996, rev. May 2003).

communication. Depending on the individual recipient, the printed word may be a likely to offend as images on a screen or in newspapers.

In *Florida Bar*, the Court recognized the state's "substantial interest . . . in protecting injured Floridians from invasive conduct by lawyers." 515 U.S. at 635. As the dissent in *Florida Bar* pointed out, the primary distinction between the targeted letters at issue in *Florida Bar* and the untargeted letters at issue in *Shapero v. Kentucky Bar Association*, 486 U.S. 466 (1988), was that "victims or their families will be offended by receiving a [targeted] solicitation during their grief and trauma." *Florida Bar*, 515 U.S. at 638. The dissent argued that the majority should not "allow restrictions on speech to be justified on the ground that the expression might offend the listener." *Id.*

But the majority of the Supreme Court in *Florida Bar* held otherwise. It focused on a subset of the public in analyzing the First Amendment: essentially, a First Amendment analogue to tort law's thin-skull plaintiffs, those who have a "porcelain heart." Some accident victims and their families might welcome targeted solicitations that inform them of their legal rights immediately after the accident (particularly when insurance companies may already be knocking on their doors). Other accident victims and their families might be perturbed—but not outraged—by the targeted solicitations. The Supreme Court, however, tailored First Amendment law, in the context of attorney solicitations, to the most sensitive members of the public. It is with these porcelain hearts in mind that we must evaluate New York's moratorium.

### b. Wemmick's Castle[19]

In addition to a heightened concern for public sensitivity to potentially offensive attorney communications, the Court in *Florida Bar* upheld the moratorium in part because of its belief

---

[19] In Charles Dickens' "Great Expectations," the character of Mr. Wemmick has a home that is literally his castle, complete with a drawbridge and moat that are used to separate his lives inside and outside the home.

that people should be given more of an option to avoid offensive speech in the privacy of their homes. *See Florida Bar*, 515 U.S. at 625 ("[W]e have consistently recognized that the State's interest in protecting the well-being, tranquility, and privacy of the home is certainly of the highest order in a free and civilized society." (quotation marks and alterations omitted)).

In this respect, the Court was adhering to a long-held position:

> One important aspect of residential privacy is protection of the unwilling listener. Although in many locations, we expect individuals simply to avoid speech they do not want to hear, the home is different. "That we are often 'captives' outside the sanctuary of the home and subject to objectionable speech . . . does not mean we must be captives everywhere." *Rowan v. U.S. Post Office Dep't*, 397 U.S. 728, 738, 90 S. Ct. 1484, 1491, 25 L.Ed.2d 736 (1970). Instead, a special benefit of the privacy all citizens enjoy within their own walls, which the State may legislate to protect, is an ability to avoid intrusions. Thus, we have repeatedly held that individuals are not required to welcome unwanted speech into their own homes and that the government may protect this freedom.

*Frisby v. Schultz*, 487 U.S. 474, 484–85 (1988) (some internal citations omitted); *Rowan v. U.S. Post Office Dep't*, 397 U.S. 728, 737 ("The ancient concept that 'a man's home is his castle' into which 'not even the king may enter' has lost none of its vitality, and none of the recognized exceptions includes any right to communicate offensively with another."). In *Rowan*, the Supreme Court "categorically reject[ed] the argument that a vendor has a right under the Constitution or otherwise to send unwanted material into the home of another," and held that "[t]he asserted right of a mailer . . . stops at the outer boundary of every person's domain." *Id*. at 738.

Yet, a letter in a mailbox is no more intrusive than the newspaper in the mailbox, the e-mail in one's inbox, the television in the living room, the radio in the kitchen, or the Internet in the study. Arguably, mail is directly targeted at a residence, whereas television, radio, and the Internet may be viewed outside the home. But the Court has seemingly not focused on this

distinction, and, instead, has held that the home should be protected from offensive language that disturbs domestic tranquility through the airwaves:

> Patently offensive, indecent material presented over the airwaves confronts the citizen, not only in public, but also in the privacy of the home, where the individual's right to be left alone plainly outweighs the First Amendment rights of an intruder. Because the broadcast audience is constantly tuning in and out, prior warnings cannot completely protect the listener or viewer from unexpected program content. To say that one may avoid further offense by turning off the radio when he hears indecent language is like saying that the remedy for an assault is to run away after the first blow. One may hang up on an indecent phone call, but that option does not give the caller a constitutional immunity or avoid a harm that has already taken place.

*FCC v. Pacifica Found.*, 438 U.S. 726, 748–49 (1978) (internal citation omitted) (upholding the FCC's regulation of radio broadcast); *cf. Rowan*, 397 U.S. at 736–37 ("[A] mailer's right to communicate must stop at the mailbox of an unreceptive addressee."). Once again, we find no reason to distinguish among these media for our First Amendment analysis.

### c. Lawyers' Reputations

Finally, *Florida Bar* recognized the state's "substantial interest . . . in preventing the erosion of confidence in the [legal] profession that . . . repeated invasions [of privacy by lawyers] have engendered." 515 U.S. at 635. The *Florida Bar* court distinguished between two kinds of direct-mail advertisements: (1) those that cause offense to the recipient and whose harm can "be eliminated by a brief journey to the trash can," *id.* at 631; *see also Bolger*, 463 U.S. 60 (rejecting federal ban on direct-mail advertisements for contraceptives), and (2) those whose harmful effects extend beyond the recipient by, for example, tarnishing the reputation of a professional group. *See Florida Bar*, 515 U.S. at 631 ("The Bar is concerned not with citizens' 'offense' in the abstract, but with the demonstrable detrimental effects that such 'offense' has on the profession it regulates. Moreover, the harm posited by the Bar is as much a function of simple receipt of targeted solicitations within days of accidents as it is a function of the letters' contents.

Throwing the letter away shortly after opening it may minimize the latter intrusion, but it does little to combat the former." (internal citations omitted)). A solicitation that offends is not likely to be any less detrimental to the reputation of lawyers when spoken aloud, displayed on a computer screen, or conveyed by television.

Accordingly, we conclude that ads targeting certain accident victims that are sent by television, radio, newspapers, or the Internet are more similar to direct-mail solicitations, which can properly be prohibited within a limited time frame, than to "an untargeted letter mailed to society at large," which "involves no willful or knowing affront to or invasion of the tranquility of bereaved or injured individuals and simply does not cause the same kind of reputational harm to the profession" as direct mail solicitations. *Florida Bar,* 515 U.S. at 630.

Moreover, we do not find constitutional fault with the 30-day time period during which attorneys may not solicit potential clients in a targeted fashion. As with *Florida Bar*'s "short temporal ban," New York's moratorium permits attorneys to advertise to the general public their expertise with personal injury or wrongful death claims. It thereby fosters reaching the accident victims, so long as these victims are not specifically targeted. It further allows accident victims to initiate contact with attorneys even during the thirty days following an accident. *See Florida Bar*, 515 U.S. at 633. In fact, as *amici* New York State Bar Association point out, New York's moratorium is more narrowly tailored than that of *Florida Bar* insofar as it incorporates the Task Force Report's fifteen-day black-out period, which shortens the moratorium period to fifteen days where an attorney or law firm must make a filing within thirty days of an incident as a legal prerequisite to a particular claim. N.Y. Comp. Codes R. & Regs., tit. 22, §§ 1200.52(e), 1200.36(a), 1200.36(b). No doubt the statute could have been more precisely drawn, but it need

not be "perfect" or "the least restrictive means" to pass constitutional muster. *Bd. of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989).

New York's moratorium provisions prohibit targeted communications by lawyers to victims, their families, or their representatives as to a specific personal injury or wrongful death event, where such communications occur within thirty days of the incident in question. Where a legal filing is required within thirty days, the moratorium is limited to fifteen days. These provisions, although they reach a broader range of advertisements than those proscribed by the moratorium in *Florida Bar*, do not impose barriers inconsistent with the First Amendment. We conclude that the moratorium provisions, as construed, are sufficiently narrowly tailored to survive constitutional scrutiny.

## CONCLUSION

The thorough and well-reasoned opinion of the District Court is AFFIRMED, except as to N.Y. Comp. Codes R. & Regs., tit. 22, § 1200.50(c)(3)'s ban on "the portrayal of a fictitious law firm, the use of a fictitious name to refer to lawyers not associated together in a law firm, or otherwise imply[ing] that lawyers are associated in a law firm if that is not the case." With respect to this portion of § 1200.50(c)(3) only, the judgment of the District Court is REVERSED.